# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| **LUCY KIMBERLY FORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cv-02346-TLP-atc** |
| | ) | |
| **MEMPHIS-SHELBY COUNTY** | ) | |
| **SCHOOLS A.K.A. SHELBY COUNTY** | ) | |
| **BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Shelby County Board of Education's ("SCBE") Motion for Summary Judgment and statement of undisputed material facts, filed on May 3, 2023.[1]  (ECF Nos. 29, 30.)  *Pro se* Plaintiff Lucy Ford responded in opposition and submitted additional material facts on May 26, 2023.  (ECF Nos. 32–35.)  SCBE then submitted a reply and response to some of Ford's additional facts on June 7, 2023.  (ECF Nos. 36, 37.)

For the reasons stated below, it is recommended that SCBE's Motion for Summary Judgment be granted in part and denied in part.

---

[1] Pursuant to Administrative Order No. 2013-05, this case has been referred to the United States Magistrate Judge for management and for all pretrial matters for determination and/or report and recommendation as appropriate.

## PROPOSED FINDINGS OF FACT

### I.    Procedural History

Ford filed this case on June 6, 2022, alleging employment discrimination against SCBE on the basis of her sex, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Tennessee Human Rights Act, Tennessee Code Annotated §§ 4-21-101 to 4-21-408 ("THRA").  (ECF No. 1.)  On June 28, 2022, SCBE filed a motion to dismiss, contending that some of Ford's claims are time barred, some should be dismissed for failure to exhaust administrative remedies, and all should be dismissed for failure to plead the essential elements of a sex discrimination or retaliation claim.  (ECF No. 9.)

On January 21, 2023, this Court entered a Report and Recommendation ("R&R") on the motion to dismiss.  (ECF No. 18.)  The Court found that, when accepting the allegations of the Complaint as true at the motion to dismiss stage, Ford's claims as alleged were not time barred and should not be dismissed for failure to exhaust administrative remedies or to adequately plead the elements of her Title VII and THRA claims.  (*Id.* at 9–14.)  The R&R recommended that the motion to dismiss be denied and that Ford be required to file an amended complaint to support her claims with additional factual allegations.  (*Id.* at 9, 15.)  Ford filed her Amended Complaint on January 30, 2023.[2]  (ECF No. 19.)  On March 9, 2023, District Judge Thomas L. Parker entered an order adopting the R&R and noting that Ford had already amended her Complaint as recommended in the R&R.  (ECF No. 22, at 5.)

---

[2] In the R&R, the Court noted that Ford brings three different types of Title VII and THRA claims: sex discrimination, hostile work environment, and retaliation.  (*Id.* at 7.)  Though Ford's Amended Complaint does not contain a specific cause-of-action section, the allegations appear to address these same three types of claims.  (*See* ECF No. 19, at 2.)

## II.    Undisputed Material Facts

SCBE seeks summary judgment on multiple grounds.  First, it asserts that Ford's standalone claim for sexual harassment based on events from 2019 is time-barred.  (ECF No. 29-1, at 9.)  Next, it argues that Ford cannot establish the elements of her hostile work environment claims.  (*Id.* at 9–14.)  And finally, SCBE asserts that Ford has failed to show any triable issues with respect to her retaliation claim.  (*Id.* at 15–22.)  Ford maintains that genuine disputes of material fact exist as to all three categories of claims raised in the Amended Complaint, thereby rendering summary judgment improper.  (ECF No. 33.)

As a threshold matter, the Court must determine which facts are undisputed for purposes of ruling on SCBE's motion for summary judgment.  Along with its motion, SCBE filed a statement of forty-five undisputed material facts.  (ECF No. 30.)  SCBE's facts are supported by the affidavit of Marchera S. James, principal of Highlands Oaks Elementary School, where Ford is employed; exhibits to James's affidavit; and excerpts from Ford's deposition.  (ECF Nos. 30-1, 30-2.)  Along with her response to the Motion, Ford filed a response to SCBE's statement of facts, in which she concedes twenty-nine of them and disputes sixteen;[3] Ford's response is supported by various emails, hand-written notes, and a letter from a medical provider, as well as citations to the documents relied on by SCBE.  (ECF No. 35.)  Ford also submitted a statement of three additional material facts, none of which SCBE disputes.  (ECF No. 37.)

Given the foregoing, the Court finds the following facts are undisputed and material for purposes of ruling on this summary judgment motion:

---

[3] Specifically, Ford does not contest SCBE's facts numbered 1–7, 9, 10, 12–17, 19, 20, 24–29, 31, 33, 36–38, and 40.  She disputes facts numbered 8, 11, 18, 21–23, 30, 32, 34, 35, 39, 41–45.

Ford began working as a second-grade teacher at Highland Oaks Elementary School during the 2018–19 school year. (ECF No. 35 ¶ 2.) On August 21, 2019, Ford walked her students to Christopher Paxton's classroom for music class. (*Id.* ¶ 3.) As she walked away from her students and Paxton, while Paxton remained standing in the doorway of his classroom, Ford heard a loud whistle that brought a reaction from her students. (*Id.* ¶¶ 3, 4.) Because Ford was walking away from Paxton's classroom, she did not see him whistle. (*Id.* ¶ 5.)

The next day, August 22, 2019, Ford reported the incident to James. (*Id.* ¶ 6.) James met with Paxton that same day. (*Id.* ¶ 7.) Paxton denied whistling at Ford and stated that he had whistled at a student who was dressed up for picture day. (ECF No. 30 ¶ 8.)[4] Whether Paxton actually whistled at that student or at Ford is in dispute.[5] At the conclusion of the meeting, James emphasized the seriousness of the allegations to Paxton and advised him not to whistle or sing in the hallway to maintain a safe and comfortable school environment. (ECF No. 35. ¶ 9.) James documented her meeting with Paxton in a Principal Conference Form. (*Id.* ¶ 10.) At Ford's request, James agreed to reassign Highland Oaks's other music teacher to Ford's class for the remainder of the school year. (ECF No. 30 ¶ 11.)[6]

---

[4] Though Ford disputes Paxton's version of these events, she does not dispute this description of what Paxton actually told James in that meeting. (*See* ECF No. 35 ¶ 8.)

[5] Ford asserts that her "students credited her as the recipient of that 'cat whistle' when they reacted in unison shouting, 'Oooh, Mr. Paxton likes Ms. Ford.'" (ECF No. 35 ¶ 8 (citing, e.g., ECF No. 30-2, at 13:7–21).) SCBE counters this assertion with evidence that James questioned several students, who corroborated Paxton's version of events. (ECF No. 30-1 ¶ 9.) These facts are therefore in dispute.

[6] Ford concurs that James agreed to reassign Paxton, but she contends that James did not do so—"Mr. Paxton continued to be assigned as Ms. Ford's even up to the 2022–2023 school year." (ECF No. 35 ¶ 11.) The portions of the record she cites in support of this statement, however, do not offer that support. She first cites her own deposition, in which the following exchange occurred:

For the 2020–21 school year, however, Paxton was again assigned as the music teacher for Ford's class.  (ECF No. 35 ¶ 14.)  From August 2020 until March 1, 2021, all students attended school virtually, and all school-based employees worked remotely.  (*Id.* ¶ 13.)  During that period, Paxton did not engage in any harassing behavior towards Ford.  (*Id.* ¶ 15.)  Upon returning to in-person teaching, Ford could recall one interaction with Paxton.  (*Id.* ¶¶ 17, 18.)  In April 2021,[7] Paxton attempted to deliver a piece of paper to Ford and tried to force her to take the paper out of his hands, though she repeatedly asked him to place the paper on her table or desk.  (*Id.* ¶ 18.)[8]

---

Q.    So we talked about how Mr. Paxton was removed as your music teacher in the previous academic school year.
A.    And then turned around the next —
Q.    Then the start of the August 2020–2021 school year he was reassigned as your music teacher. . . .

(ECF No. 30-2, at 50:17–22.)  This testimony reflects Ford's agreement that Paxton was removed as her class's music teacher for the remainder of the 2019–20 school year.  Ford's remaining citations are to James's affidavit, which reflects the same information as SCBE's proposed fact, and "Ford Discovery," which is not a valid citation to any record evidence.  "When confronted with a properly supported motion for summary judgment, the non-moving party must set forth specific facts showing that there is a genuine dispute for trial" and "has the duty to point out specific evidence in the record sufficient to justify a jury decision in its favor."  *Elvis Presley Enter., Inc. v. City of Memphis, Tenn.*, No. 2:18-cv-2718-SHM-atc, 2020 WL 6163564, at *3 (W.D. Tenn., 2020) (citing Fed. R. Civ. P. 56(c)(1); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)); *see also Jones v. Mayble*, 2:18-cv-02875-TLP-tmp, 2021 WL 1951171, at *2 (W.D. Tenn. 2021) (quoting *Garrett v. Mich. Dep't of Corr.*, No. 3:18-cv-12844, 2020 WL 5223800, at *5 (E.D. Mich. 2020) ("[W]hen opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and . . . a party's status as a pro se litigant does not alter this duty on a summary judgment motion." (quoting *Garrett v. Mich. Dep't of Corr.*, No. 3:18-cv-12844, 2020 WL 5223800, at *5 (E.D. Mich. 2020)).  This fact is therefore deemed undisputed.

[7] SCBE asserts this event occurred on April 12, 2021, whereas Ford asserts that it occurred on April 19, 2021.  (*Id.* ¶ 18.)  This dispute is immaterial to the issues presently before the Court.

[8] Though the parties' description of this event differs somewhat, they both rely on the same record citation—Ford's deposition testimony.  (*See id.* ¶ 18; ECF No. 30-2, at 56:9–20, 59:2–9.)

On April 12, 2021, Ford attended a doctor's appointment and was not at work.  (ECF No. 35 ¶ 20.)  That day, the other second-grade teachers were given the opportunity to sign up for a summer reading program that would enable teachers completing the program to earn $1,000.  (*Id.* ¶¶ 19, 20.)  Because Ford was absent, she was not able to sign up.  (*Id.* ¶ 20.)

On April 21, 2021, Ford submitted an internal SCBE grievance form identifying, as the "[n]ature of violation," various policies and laws regarding the re-opening of schools.  (*Id.* ¶ 21.)[9]  In a written response, sent April 28, 2021, James memorialized her understanding of Ford's grievances about compliance with COVID-19 protocols and Ford's concerns regarding comments made during a deliberate practice session.  (ECF No. 30 ¶ 22.)[10]  James also described how she had addressed Ford's concerns.  (*Id.*)

Ford appealed her grievance, and a meeting was held on May 5, 2021.  (ECF No. 30-1 ¶ 18; ECF No. 35 ¶ 22.)  Ford's concerns regarding social distancing not being observed were discussed, as was her contention that "she is now being ostracized by both colleagues and admin team."  (ECF No. 35 ¶ 22; ECF No. 30-1, at Ex. 2 (PageID 209).)  In emails leading up to the meeting, Ford's union representative said, among other things, that "the work environment for Ms. Ford has becoming [sic] increasingly more hostile."  (ECF No. 35, at Ex. 3 (PageID 330–31).)[11]

---

[9] The parties offer different descriptions of what Ford listed as the "[n]ature of violation," but that dispute is not material to the issues before the Court, and the document, in any event, speaks for itself.  (*See id.* ¶ 21; ECF No. 30-1, at Ex. 2 (PageID 207).)

[10] Ford asserts this fact is disputed but offers nothing to contradict it, instead providing only information about a later meeting on May 5, 2021.  (ECF No. 35 ¶ 22.)  This fact is therefore deemed undisputed.

[11] SCBE does not address these emails, and thus the Court will consider them as presenting undisputed facts.  Ford also provides what appear to be written notes regarding the meeting (*id.* at PageID 332–35), but without additional information regarding the source or authenticity of these writings, the Court will not consider them for purposes of summary judgment.

It was suggested at the meeting that Ford be replaced as team leader for the second-grade

teachers.  (ECF No. 35 ¶ 23.)  SCBE contends that the replacement was designed to "address Ms.

Ford's concern about in-person social interactions among employees," as "the team lead is

responsible for meeting about lesson plans and coordinating duties among the other teachers in

the grade."  (*Id.*)  Ford, on the other hand, testified that James stated during the meeting that "I

just no longer want Ms. Ford to be team lead . . . I just don't," testimony that SCBE does not

dispute.  (*Id.*; ECF No. 30-2, at 75:2–76:4.)  A team leader is not paid differently than the other

teachers on their team, and a different teacher is selected to serve as team leader every year.  (*Id.*

¶¶ 25–26.)  Ford did not accept this solution and further appealed her grievance.  (ECF No. 30-1

¶ 21.)

A third meeting was held on June 4, 2021.  (*Id.* ¶ 21.)  At this meeting, Ford's prior

complaint regarding Paxton was discussed, including the whistling incident and the paper

incident.  (*Id.* at Ex. 2 (PageID 209).)  Ford explained that the resolution sought was to keep

Paxton away from her.  (*Id.*)  Ford also relayed that she felt she was being retaliated against due

to her COVID-19 concerns.  (*Id.* at PageID 210.)  The Findings of Fact from the meeting include

that Ford had reported a claim of sexual harassment against Paxton to James, that an Employee

Relations advisor instructed James to handle the situation, and that James appropriately handled

the incident.  (*Id.*)

Ford filed an EEOC charge of discrimination on July 28, 2021.  (ECF No. 1-1.)  She did

not discuss filing the charge with anyone at the school, and she is unaware if anyone knew that

she had filed the charge.  (ECF No. 35 ¶¶ 27–28.)

Ford's next interaction with Paxton was on October 8, 2021, when Paxton came to her

room and informed her that he would be removing student work from the wall outside of Ford's

classroom. (ECF No. 30 ¶ 30.)[12] Shortly after, Ford's teacher's assistant found the student work on the floor outside the classroom. (ECF No. 35 ¶ 30; ECF No. 30-2, at 100:1–101:19.) Ford is not sure if Paxton did the same for other teachers. (ECF No. 35 ¶ 31.)

Ford decided to apply to the school's summer learning academy but was not selected. (ECF No. 35 ¶ 32.)[13] Ford does not know how many positions were available at the Highland Oaks Elementary School location, how many applications were processed by the central office, or if James had any involvement in the selection of teachers for the program. (*Id.* ¶ 33.)

Ford's 2019–20 performance evaluation resulted in an observation score of 4.0 out of 5.0. (*Id.* ¶ 12.) The performance evaluation was conducted by James. (*Id.*) For her 2020–21 evaluation, again conducted by James, her observation score was 4.42 out of 5.0. (*Id.* ¶ 29.) For her 2021–22 evaluation, which was conducted by Assistant Principal Shaleah Carson, Ford's observation score was 4.28 out of 5.0. (ECF No. 30 ¶ 35.)[14] The total observation score is largely based on teaching performance as determined by classroom observations, and 5–10% of the total is based on a professionalism score. (*Id.* ¶¶ 36–37.)

At the end of each academic school year, the lead teachers work together to create class lists for each teacher for the next academic school year. (*Id.* ¶ 38.) The process ensures that

---

[12] Ford describes Paxton's actions as "barg[ing]" into her classroom, but she does not otherwise dispute this fact. (ECF No. 35 ¶ 30.)

[13] SCBE contends Ford applied for the summer of 2022, whereas Ford contends she applied for the summer of 2021. (*Id.*) This dispute is material, as SCBE contends Ford's name was not on the list of applications for 2022, which Ford contends is explained by the fact that she applied in 2021.

[14] Ford contends that her 2021 observation score was instead 4.29, but she cites only her deposition testimony in support, which does not include either number. (ECF No. 35 ¶ 35; ECF No. 30-2, at 111:4–112:9.) Ford also asserts that 4.29 is the lowest score she has received since she became a teacher and since she began teaching second grade (ECF No. 35 ¶ 35), a contention directly refuted by the fact she does not dispute that she was scored 4.0 in 2019–20 (*id.* ¶ 12).

classes are balanced in the number students who receive special education or may have

behavioral challenges and based on academic achievement.  (*Id.*)  That process was completed

for the 2022–23 school year, and the lists were provided to James.  (ECF No. 30 ¶ 39.)[15]  James

approved the proposed class lists without making any changes.  (ECF No. 35 ¶ 40.)

During the 2022–23 school year, Ford had two interactions with Paxton.  The first

occurred on August 8, 2022, when Paxton came to Ford's classroom door to ask about a student

who was a "car rider," and Ford informed Paxton that the student was not assigned to her class.

(ECF No. 30 ¶ 41.)[16]  Ford acknowledges that there is fluidity in classroom rosters during the

first week of school.  (ECF No. 30 ¶ 42.)[17]  The second occurred on February 16, 2023,

following a school program held in honor of Black History Month.  (ECF No. 35 ¶ 43.)[18]  The

school invited professionals from the community to discuss their career paths with students.  (*Id.*)

After the event, Paxton was one of the employees assigned to gather the guests.  (*Id.*)  Paxton

---

[15] Ford contends that this fact is disputed and argues that SCBE's evidence in support of the fact
is of questionable authenticity.  (ECF No. 35 ¶ 39.)  She is correct, for example, that SCBE
provides no key or explanation of the abbreviations used on the class lists (other than via
argument in the memorandum supporting SCBE's motion).  Ford does not assert, however, that
the lists were unbalanced.  She states that she is aware of the duties of team leaders and
"reasonably expected that the second-grade team leader, Ms. Callie Nichols would optimally and
equitably assign students and teachers using best practices for achieving the best outcomes for
students and teachers, alike."  (*Id.*)  She further states that it was reasonable for her to expect that
James would only approve the assignments after appropriate review.  (*Id.*)  She does not,
however, state that either Nichols or James failed to do so, and she does not contend that the
classroom assignments were inequitable.  (*See id.*)  As such, this fact is deemed undisputed.

[16] Ford attempts to place this fact in dispute by reiterating that Paxton interacted with her "in . . .
direct violation of the School Board's imposed restricted interactions. . . ."  (ECF No. 35 ¶ 41.)
This information, even if true, fails to place this fact in dispute.

[17] Ford purports to dispute this fact but then directly admits it.  (ECF No. 35 ¶ 42.)  Ford then
provides additional facts that neither bring this fact into dispute nor are supported by any citation
to record evidence.

[18] Ford purports to dispute this fact but instead provides additional related facts and maintains
that Paxton's actions were "in direct violation with the School Board's imposed restrictions for
physical interactions with Ms. Ford."  (*Id.*)

opened to door to Ford's classroom, poked his head inside for less than ten seconds, and then

left. (*Id.* ¶ 44.)[19]  Ford acknowledges that Paxton has never texted her, initiated a conversation

with her outside of the school environment, or sent an email only to her.  (ECF No. 30 ¶ 45.)[20]

## PROPOSED CONCLUSIONS OF LAW

### I.    Legal Standard for Summary Judgment

Courts evaluate motions for summary judgment under Federal Rule of Civil Procedure

56(a).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of

factually unsupported claims or defenses."  *Harper v. City of Cleveland*, 781 F. App'x 389, 392

(6th Cir. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  Thus, summary

judgment is appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also*

*Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017) ("Summary

judgment is proper when, viewing the evidence in the light most favorable to the nonmoving

party, there is no genuine dispute as to any material fact and the moving party is entitled to

judgment as a matter of law.") (quoting *Thomas M. Cooley Law Sch. V. Kurzon Strauss, LLP*,

759 F.3d 522, 526 (6th Cir. 2014)).  "A material fact is one 'that might affect the outcome of the

suit,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'"  *Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The moving party bears the burden

---

[19] Ford disputes SCBE's contention that Paxton was escorting guests "because there were no
guests in Ms. Ford's classroom."  (*Id.*)  That fact is not material to the issues before the Court,
however, and Ford does not otherwise dispute the facts surrounding this interaction with Paxton.

[20] Ford attempts to bring this fact into dispute by pointing to an interaction she had with Paxton
on the playground outside of the school building.  (ECF No. 35 ¶ 45.)  Because this interaction
occurred within the school environment, Ford fails to adequately dispute this fact.  (*Id.*)

of showing that no genuine issues of material fact exist." *McClellan v. Midwest Machining, Inc.*,
900 F.3d 297, 302 (6th Cir. 2018) (citing *Celotex*, 477 U.S. at 324).

In evaluating summary judgment motions, a court must "draw all reasonable inferences
in favor of the nonmoving party." *Harper*, 781 F. App'x at 392 (citing *Matsushita Elec. Indus.
Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Nevertheless, "[t]he nonmoving party
must do more than simply 'show that there is some metaphysical doubt as to the material facts.'"
*Stevens-Bratton v. TruGreen, Inc.*, 437 F. Supp. 3d 648, 652 (W.D. Tenn. 2020) (quoting *Lossia
v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018)). A properly supported motion for
summary judgment will not be defeated by conclusory allegations, speculation, or
unsubstantiated assertions. *Bradley v. Wal-Mart Stores E., LP*, 587 F. App'x 863, 866 (6th Cir.
2014) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). In determining whether a
dispute of material fact exists, "[t]he court need consider only the cited materials, but it may
consider other materials in the record." Fed. R. Civ. P. 56(c)(3). At the same time, "[a] district
court is not required to search the entire record to establish that it is bereft of a genuine issue
material fact," as "judges are not like pigs, hunting for truffles that might be buried in the
record." *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (citations,
quotations, and alterations omitted).

"Although summary judgment must be used carefully, it 'is an integral part of the Federal
Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination
of every action[,] rather than a disfavored procedural shortcut." *Stevens-Bratton*, 437 F. Supp.
3d at 652 (quoting *FDIC v. Jeff Miller Stables*, 573 F.3d 289, 294 (6th Cir. 2009)). Ultimately,
"[w]hen the non-moving party fails to make a sufficient showing of an essential element of his
case on which he bears the burden of proof, the moving parties are entitled to judgment as a

matter of law, and summary judgment is proper." *Peterson v. Medtronic, Inc.*, No. 2:17-cv-02457-MSN-atc, 2020 WL 6999225, at *4 (W.D. Tenn. Sept. 30, 2020) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013)).  "These standards apply regardless of a party's *pro se* status; the liberal pleading standard for *pro se* parties is inapplicable once a case has progressed to the summary judgment stage." *Almasri v. Valero Ref. Co. – Tenn., LLC*, No. 2:20-cv-02863-SHL-tmp, 2022 WL 895732, at *3 (W.D. Tenn. Fed. 18, 2022), *report and recommendation adopted*, 2022 WL 891842 (W.D. Tenn. Mar. 25, 2022) (citations and internal quotations omitted); *see also Jones*, 2021 WL 1951171, at *2 ("Just because Plaintiff is pro se does not alter his obligations under Rule 56.  Rather, 'liberal treatment of pro se pleadings does not require lenient treatment of substantive law.'" (quoting *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006))).

## II.    Ford's Title VII Claims

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Ford asserts three different types of Title VII claims: sex discrimination, hostile work environment, and retaliation.

### A.   Ford's Discrete Claims of Sexual Harassment

As discussed in the prior R&R, any discrete claim of sexual harassment based on an incident occurring prior to October 1, 2020, is time-barred.  (ECF No. 18, at 7.)  Just as it was unclear at that time whether Ford alleged discrete claims of harassment occurring before October 1, 2020, the allegations in the amended complaint remain unclear.  To the extent Ford seeks to

plead discrimination claims based on acts that occurred on August 21, 2019, and October 7, 2019,[21] those claims are time-barred.

It is also unclear whether Ford seeks to plead discrete discrimination claims based on acts occurring after October 1, 2020.  The remaining incidents she identifies as additional "alleged discriminatory acts" appear to relate to her claims of retaliation and/or hostile work environment, discussed below.  (ECF No. 19, at 4–9.)  To the extent she intends to assert discrete discrimination claims based on any of these alleged acts, she has failed to allege or demonstrate that similarly situated non-protected employees were treated more favorably than she was, an essential element of a Title VII discrimination claim.  *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 654–55 (6th Cir. 2015).  As such, it is recommended that Ford's discrete discrimination claims be dismissed as time-barred or inadequately supported.

B.    Ford's Hostile Work Environment Claim

"In general, to prevail on a hostile work environment claim stemming from a co-worker's actions, a plaintiff must show that (1) he or she was a member of a protected class; (2) he or she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action."  *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir.

---

[21] In her Amended Complaint, Ford alleges, "On October 7, 2019, MSCS engaged in unlawful employment practices, in that, it discriminated against me for making Sexual Harassment charges on the basis of testifying, assisting, and participating in enforcement proceedings . . . ." (ECF No. 19, at 3.)  Ford appears to have abandoned a discrimination claim arising from the October 7, 2019 event, however, as she does not mention any such event in her summary judgment response.  Furthermore, this allegation is unsupported by any facts and is merely a recitation of the law.  The Court thus also recommends dismissal of any discrimination claim arising from an event alleged to have occurred on October 7, 2019, based on the conclusory nature of this allegation.

2016) (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)).  Ford

has failed to demonstrate the fourth element, and thus the Court will refrain from consideration

of the other four.

To assess the fourth prong, courts "must examine the totality of the circumstances."

*Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (citing *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 23 (1993)).  This examination considers "the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.*

(quoting *Harris*, 510 U.S. at 23).  "Conduct must be extreme to amount to a change in the terms

and conditions of employment."  *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788

(1998)).  "Simple teasing, . . . offhand comments, and isolated incidents (unless extremely

serious) will not amount to discriminatory changes in the terms and conditions of employment."

*Id.*  Isolated incidents of harassment, unless extremely serious, are not sufficient to sustain a

hostile work environment claim.  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir.

2000) (internal citations omitted).

A plaintiff seeking to establish a claim of sex-based hostile work environment must show

that the workplace was "'permeated with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment.'"  *Smith*, 813 F.3d at 309 (citing *Harris*, 510 U.S. at 21).  "A

plaintiff must show that the work environment was both subjectively and objectively hostile; in

other words, that the plaintiff not only perceived the work environment as hostile, but that a

reasonable person would have found it hostile or abusive as well."  *Id.*  "The third prong,

however, limits the scope of the analysis in the fourth prong: 'only harassment based on the

14

plaintiff's [protected class] may be considered.'" *Jefferson v. Fresenius Med. Care Holdings, Inc.*, No. 3:17-cv-00697, 2019 WL 4725194, at *14 (M.D. Tenn. Aug. 30, 2019) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)).

The Sixth Circuit has provided examples of cases that were not "sufficiently severe or pervasive" to satisfy the fourth prong of a hostile work environment claim, even though they involved "deplorable and offensive" conduct. *Lovelace v. BP Prod. N. Am.*, 252 F. App'x 33, 41 (6th Cir. 2007). For example, in a case involving five clear instances of sexual harassment over a fifteen-month period from coworkers and supervisors relating to the plaintiff's breasts and physical appearance, the court found that such evidence was "insufficient to survive summary judgment" on a hostile work environment claim. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 568–70 (6th Cir. 2021).

In reaching this conclusion, the *Nathan* court considered and analyzed established Sixth Circuit precedent involving the requirement that the work environment must be objectively hostile and what a plaintiff must show to survive summary judgment. *Id.* (citing, e.g., *Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir. 2000), as "holding that a 'a single battery coupled with two merely offensive remarks over a six-month period [did] not create an issue of material fact'"; *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 708, 715 (6th Cir. 2007), as "deciding that fifteen incidents of mostly 'offensive utterances' over a two-year period were not severe or pervasive"; *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 790 (6th Cir. 2000), as holding that the plaintiff did not present sufficient evidence to survive summary judgment when "the harasser told the plaintiff several inappropriate jokes, made a verbal sexual advance toward the plaintiff, referred to the plaintiff as 'Hot Lips[,]' and made 'isolated comments about [the] plaintiff's state of dress"; and *Williams v. Gen. Motors Corp.*, 187 F.3d. 553, 563 (6th Cir. 1999), as "finding

15

harassment to be severe or pervasive when there were more than a dozen incidents, many of which involved sexually aggressive behavior, over a period of one year").

The *Nathan* court also considered *Bowman*, in which "this court concluded that three instances of physically invasive conduct, including a supervisor's grabbing the plaintiff's buttocks and saying that 'she controlled [plaintiff's] ass and she would do whatever she wanted with it,' coupled with repeated unwanted sexual advances, did not constitute severe or pervasive harassment." *Id*. at 569 (quoting *Bowman*, 220 F. 3d at 458–59, 464). The *Nathan* court observed that, "[a]lthough *Bowman* may set the outer limits on what conduct a reasonable person could not believe creates a hostile work environment, the harassment [the plaintiff] experienced is within that limit." *Id.*

Based on this Sixth Circuit precedent and the totality of the summary judgment record before the Court, Ford has not demonstrated that the alleged harassment she experienced was so severe that it created a hostile work environment. Ford claims that, over the course of three and a half years, Paxton harassed her on five different occasions. The alleged harassment began on August 21, 2019, when Paxton whistled at, allegedly, Ford. Whether Paxton's whistle was directed at Ford is a disputed fact. However, even assuming Ford's version of events is correct, this unwelcome whistling is the only instance of harassment that could be said to be based on Ford's sex.

Each of the other instances that Ford points to when she interacted with Paxton cannot be said to be explicitly or implicitly related to her sex. Ford alleges that, even though Paxton was instructed to stay away from her, he continued to interact with her—once by trying to force her to take paper from his hands, once by telling her that he was removing student work from the wall outside her classroom, once by asking about a student, and once by poking his head into her

16

classroom.  Ford does not allege or prove how any of these interactions could be considered sexual in nature.[22]

And even if the interactions had been overtly sexual in nature, Ford's hostile work environment claim cannot survive summary judgment because the interactions do not amount to severe discrimination.  Even when drawing all reasonable inferences in favor of Ford, she has not shown or alleged a hostile work environment consisting of harassment as frequent or severe as that required by the Sixth Circuit on summary judgment.  *See Nathan*, 992 F.3d at 568–70 (collecting cases).  Her contentions certainly fall well short of the circumstances in *Bowman*, which were also found to be insufficient to proceed past summary judgment on a hostile work environment claim.  *See* 220 F. 3d at 458–59, 464.  Though Ford's interactions with Paxton may have seemed annoying or even inappropriate to her, no reasonable person would consider that conduct sufficiently severe to create a hostile and abusive working environment.  Ford has failed to create a genuine issue of fact that she experienced a hostile work environment, and SCBE should be granted summary judgment on this claim.

### C.  Ford's Title VII Retaliation Claim

To establish a claim for Title VII retaliation, an employee must show "(1) that he engaged in a protected activity; (2) that the defendant had knowledge of his protected conduct; (3) that the defendant took an adverse employment action toward him; and (4) that there was causal connection between the protected activity and the adverse employment action."  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (quoting *Weigel v. Baptist Hosp. of E.*

---

[22] Ford also identifies acts by other SCBE employees she appears to allege to be discriminatory and to contribute to a hostile work environment, such as failing to sufficiently investigate her complaint about Paxton, failing to sufficiently discipline Paxton, and overloading her class with challenging students.  (ECF No. 19, at 4–9.)  Ford similarly fails to establish that any of these acts were based on Ford's sex; they appear relevant, if at all, to her claim of retaliation.

*Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)).  For at least some of the retaliatory conduct alleged, Ford has demonstrated a genuine issue of material fact as to each element.

1.    *Protected Activity*

SCBE argues that Ford did not engage in protected activity until she filed her EEOC charge on July 28, 2021.  But SCBE interprets "protected activity" too narrowly.  Protected activity for purposes of a retaliation claim includes "oppo[sing] any practice made an unlawful employment practice" and making a charge, testifying, assisting, or participating in an "investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).  For purposes of the "opposition clause," "the term 'oppose' should be interpreted based on its ordinary meaning: 'to resist or antagonize; to contend against; to confront; resist; withstand.'"  *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)) (alterations omitted).  "Examples of opposition activity protected under Title VII include 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices . . . .'"  *Id.* (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)).  "When an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity."  *Id.* (quoting *Crawford*, 555 U.S. at 276) (alterations omitted).  "In a case founded upon the opposition clause, it is irrelevant that [EEOC] charges have not been filed."  *Mengelkamp v. Lake Metro. Housing Auth.*, 549 F. App'x 323, 331 (6th Cir. 2013).

Here, it is undisputed that Ford reported the whistling incident to her principal, James, on August 22, 2019, the day after it occurred.  That report of alleged harassment constitutes protected activity "within the scope of the opposition clause . . . whether or not formal charges of

discrimination have been filed with the EEOC." *Id.* at 330–31 (citations omitted).  Ford has

satisfied this element of her retaliation claim.

### 2.    *SCBE's Knowledge of Ford's Protected Activity*

It is also undisputed that SCBE knew of Ford's protected activity.  Due to SCBE's inapt

focus on the filing of Ford's EEOC charge, SCBE argues that it lacked knowledge of that charge.

Ford's first protected activity, however, occurred much sooner, as discussed above, and SCBE

undisputedly had knowledge of it.  Indeed, James herself investigated Ford's allegations and met

with Paxton the day of Ford's report, per instructions from SCBE's Employee Relations advisor

that she do so.  SCBE does not and cannot argue that it did not have knowledge of this protected

activity.

### 3.    *Adverse Employment Actions*

"To show adverse action under a retaliation claim, the 'plaintiff must show that a

reasonable employee would have found the challenged action materially adverse[,]' which would

dissuade a reasonable worker from making or supporting a charge of discrimination." *Kaminsky*

*v. Wilkie*, 856 F. App'x 602, 607 (6th Cir. 2021) (citing *Burlington N.*, 548 U.S. at 68).  "[D]e

minimis employment actions are not materially adverse for purposes of [retaliation]." *Erwin v.*

*Honda N. Am., Inc.*, No. 22-3823, 2023 WL 3035355, at *2 (6th Cir. Apr. 21, 2023) (citing

*Bowman*, 220 F.3d at 462).  In her Amended Complaint, Ford identifies a number of adverse

actions that she alleges were the product of retaliation.

First, Ford alleges that SCBE retaliated against her by failing to fully investigate her

claims against Paxton, failing to sufficiently discipline Paxton, and generally forcing her to work

with Paxton.  (ECF No. 19, at 4–9.)  However, the undisputed facts in the record demonstrate

that SCBE investigated Ford's complaints and took steps to correct Paxton's behavior.  Indeed,

in addition to James's initial investigation, Ford's complaints about Paxton were discussed at

meetings held on May 5, 2021, and June 4, 2021, and have since been addressed by SCBE in February and March of 2023 (ECF No. 37 ¶ 1).  Ford was able to "tell her side of the story, repeatedly and at length."  *Bunt v. Clarksville Montgomery Cnty. Sch. Sys.*, No. 3:21-cv-00896, 2023 WL 6881786, at \*20 (M.D. Tenn. Oct. 18, 2023).  SCBE employees "were not required to accept as true the plaintiff's version of events or even to resolve the discrepancies between the varying versions of events."  *Id.*

As a matter of law, Ford has not shown that SCBE's handling of her complaints against Paxton would dissuade a reasonable person from making a charge of discrimination.  "The mere fact that [the plaintiff] disagreed with the outcome of the various investigations is not the type of 'harm' envisioned by [*Burlington Northern*]."  *Id.*  "[T]he plaintiff has not shown that the investigations that were conducted in response to her complaints in this case were so obviously inadequate or dismissive of the plaintiff's concerns as to qualify as an adverse action."  *Id.*  As such, this conduct cannot support Ford's claim of retaliation.

Second, Ford alleges that she was retaliated against when she was prevented from participating in "Professional Development" and "Training Programs."  (ECF No. 19, at 4.)  This allegation apparently relates to the summer reading program that enabled teachers to earn $1,000.  (*See* ECF No. 35 ¶ 19.)  It is undisputed, however, that the reason Ford did not participate in that program is because she was at a doctor's appointment the day the sign-up sheet was circulated.  Ford presents no evidence that SCBE tried to prevent her from signing up for the program, that she later attempted to join the program and was declined, or that SCBE had anything to do with her not participating in the program.  This conduct does not constitute an adverse employment action.

Third, Ford alleges that she was retaliated against when she was not employed as a teacher during the summer term.  (ECF No. 19, at 4.)  SCBE claims that the denial of Ford's application for a summer teaching position does not constitute a material change in her employment because she had never worked in the summer before.  This argument fails to acknowledge, however, that being denied a promotion or overtime can constitute an adverse employment action.  *See Burlington N.*, 548 U.S. at 64; *Broska v. Henderson*, 70 F. App'x 262, 267–68 (6th Cir. 2003).  Ford's denial of a summer teaching position is conceptually similar, in that she applied for the opportunity to work more in exchange for more compensation, and she was denied that opportunity.  A factual dispute exists as to whether SCBE denied Ford's application to teach in the summer;[23] if it did, that conduct could dissuade a reasonable employee from making a charge of discrimination and thus could constitute an adverse employment action.

Fourth, Ford alleges that she was prevented from having the union representative of her choice at the May 5, 2021 meeting.  (ECF No. 19, at 4–5.)  Ford has presented no facts to support this allegation, and it thus cannot satisfy her *prima facie* burden.

Fifth, Ford alleges that she was retaliated against when she was removed as team lead. (*Id.*)  "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  *Erwin*, 2023 WL 3035355, at *3 (quoting *Burlington N.*, 548 U.S. at 71).  "Employment shifts . . . 'without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions.'"  *Id.* (quoting *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002)).  A reassignment

---

[23] Though SCBE attempts to show that Ford did not apply for the summer position, as discussed above, SCBE provided information only about applicants for the summer of 2022, whereas Ford claims she applied for the summer of 2021.

might be adverse "if it constitutes a demotion evidenced by a less distinguished title, a material

loss of benefits, significantly diminished material responsibilities, or other indices that might be

unique to a particular situation." *Id.* (quoting *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d

914, 918 (6th Cir. 2014)). "At a minimum, the employee must be able to show a quantitative or

qualitative change in the terms of the conditions of employment." *Deleon*, 739 F.3d at 919

(citing *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 753 (7th Cir. 2002)).

      Drawing all inferences in favor of Ford, she has presented a dispute of material fact that

her removal as team lead may constitute an adverse employment action.  It is undisputed that a

team leader is responsible for lesson planning, coordinating duties among the teachers, and

communicating with the administrative team on behalf of the teachers.  Thus, by being removed

as team leader, Ford experienced diminished material responsibilities.  Whether or not that

diminishment was significant in the context of Ford's employment is in dispute.  For example, it

is undisputed that a team leader is not paid differently than the other teachers on their team, and a

different teacher is selected to serve as team leader every year.  Ford testified, however, that the

position of team lead is relevant to "elevat[ing her] status" and is looked upon favorably.  (ECF

No. 35 ¶ 23 (citing ECF No. 30-2, at 74:3–76:22).)  Ford has demonstrated a genuine factual

dispute over whether her removal as team lead was materially adverse.

      Sixth, Ford alleges that she was retaliated against by receiving a lower performance score

in 2022 after her protected activity.  It is undisputed, however, that Ford's score was 4.0 in

2019–20, 4.42 in 2020–21, and 4.28 in 2021–22.  Even Ford acknowledges that her performance

scores have been consistent.  (ECF No. 35 ¶ 36.)  In addition, "to characterize a negative

performance evaluation as an adverse employment action the plaintiff must point to a tangible

employment action that she alleges she suffered, or is in jeopardy of suffering, because of the

downgraded evaluation." *Blackburn v. Shelby Cnty*., 770 F. Supp. 2d 896, 926 (W.D. Tenn.

2011) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008)).  Ford has

shown no such tangible impact arising from her performance score, and thus this action cannot

support her retaliation claim.

Seventh, Ford alleges that SCBE retaliated against her by "stacking" her class, such that

she had a disproportionately high number of students with teaching challenges, and that it

insufficiently handled her grievance related to the stacking.  (ECF No. 19, at 6–9.)  As discussed

above, however, Ford has not demonstrated a factual dispute that her class had a greater

proportion of high-need students.  Because there is no genuine dispute of material fact that the

second-grade classes were equitably balanced, this conduct cannot serve as the basis for Ford's

retaliation claim.

Finally, Ford's retaliation claims could collectively be read as asserting a claim of

retaliatory hostile work environment.  SCBE does not address this theory.  A retaliatory hostile

work environment claim is a variety of retaliation, with the *prima facie* element of adverse

employment action being satisfied by a showing that "the defendant subjected the plaintiff to

severe or pervasive retaliatory harassment."  *Khamati v. Sec'y of Dept. of the Treasury*, 557 F.

App'x 434, 443 (6th Cir. 2014) (citing *Morris*, 201 F.3d at 792).  Unlike the higher standard in

the general retaliatory discrimination context, the standard for establishing a retaliatory hostile

work environment is that the severity and pervasiveness of the hostility must be "sufficient *to*

*dissuade a reasonable worker from making or supporting a charge of discrimination*."

*Ogbonna-McGruder v. Austin Peay St. Univ.*, No. 3:21-cv-00506, 2023 WL 3572891, at *14–15

(M.D. Tenn. May 19, 2023).

However, "the Sixth Circuit requires an initial determination of severity or pervasiveness before turning to whether the severe or pervasive harassment satisfies the applicable standard (material adversity) for retaliation claims." *Id.* at *16. That determination requires an assessment of the totality of the circumstances, looking to the same factors considered in the general retaliation context. *Id.* (citing *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 707 (6th Cir. 2012)). The difference in the retaliatory hostile work environment context is that the plaintiff need not show that the hostility was based on her protected class, she need only show that the hostility was the result of retaliatory motive. *Id.* at *16 n.21.

Ford has not demonstrated a work environment sufficiently severe to support a retaliatory hostile work environment claim. As discussed above, Ford's interactions with Paxton do not suffice to establish severe harassment. Consideration of the additional circumstances that she was denied a summer teaching position and was removed as team lead do not change that conclusion. The undisputed facts in the record simply do not establish the type of severe and pervasive environment of hostility and harassment necessary, as a matter of law, to support a claim of retaliatory hostile work environment.

In conclusion, Ford has identified two potential adverse employment actions: her denial of a summer teaching position and her removal as team lead. The remainder of her allegations fails to state a materially adverse action sufficient to support her retaliation claim.

### 4. Causal Connection

Ford is last required to demonstrate that a causal connection exists between the adverse action and her protected activity. SCBE does not address causation. "To establish causality, plaintiffs often point to temporal proximity and some 'other evidence of retaliatory conduct.'" *Zarza ex rel. Zarza v. Bd. of Regents of Univ. of Mich.*, 2023 WL 3270899, at *4 (6th Cir. May 5,

2023) (quoting *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 588 (6th Cir. 2022)). A

plaintiff need only identify "'minimal' evidence to create that inference." *Id.* (quoting *A.C. ex*

*rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 701 (6th Cir. 2013)).

As to SCBE's failure to hire Ford to teach during the summer, Ford has established no

causal link. Her allegations and arguments are bare-bones in this regard—she merely asserts that

she applied and was not hired for the summer position. She has not presented evidence that

anyone who made the decision not to hire her for a summer position knew of her protected

activity or that, for example, James was involved in the decision. Ford has failed to demonstrate

a causal connection, and thus she has failed to present a *prima facie* case of retaliation as to

SCBE's failure to hire her to teach in the summer.

A genuine dispute of material fact exists, however, as to whether SCBE removed Ford as

team lead as a result of her protected activity. The decision was made during a meeting

regarding Ford's grievances, which included her complaints of a hostile work environment, and

thus it was a decision contemporaneous with Ford's protected activity. In addition, though

SCBE contends that Ford was removed as team leader to address her social-distancing concerns,

Ford has created a factual dispute as to that motivation, testifying that James stated during the

meeting that "I just no longer want Ms. Ford to be team lead . . . I just don't." Construing this

evidence in Ford's favor, Ford has satisfied her minimal burden of proof allowing an inference

that James was motivated to remove Ford as team lead due to her protected activity, and not in

response to her COVID-19 concerns. As such, Ford has presented a *prima facie* case of

retaliation as to her removal as team lead.

Because Ford has established a *prima facie* case of retaliation, the burden shifts to SCBE

under the *McDonnell Douglas* framework "to articulate a legitimate, nonretaliatory reason for

the adverse action." *Kirkland v. City of Maryville, Tenn.*, 54 F.4th 901, 910 (6th Cir. 2022)

(citing *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020)).  Having directed its

arguments exclusively to Ford's ability to make her *prima facie* case, SCBE fails to address and

thus to meet that shifted burden.  As such, it is recommended that summary judgment be denied

on the retaliation claim as it relates to Ford's removal as team lead.

## III.    Ford's THRA Claims

The analysis of claims under the THRA is the same as the analysis under Title VII.  *See*

*Cook v. Life Credit Union*, 138 F. Supp. 3d 981, 991 (M.D. Tenn. 2015) (quoting *Parker v.*

*Warren Cnty. Util. Dist.,* 2 S.W.3d 170, 172–73 (Tenn. 1999) (internal quotations omitted)).

Thus, for the reasons stated above, the Court recommends that summary judgment be granted as

to all of Ford's THRA claims other than her claim of retaliation related to her removal as team

lead.

## <u>RECOMMENDATION</u>

For the foregoing reasons, this Court recommends that summary judgment be granted

as to all Ford's Title VII and THRA claims, other than her claim of retaliation related to her

removal as team lead, for which summary judgment should be denied.

Respectfully submitted this 3rd day of November, 2023.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

## NOTICE

Within fourteen (14) days after being served with a copy of this report and recommendation
disposition, a party may serve and file written objections to the proposed findings and
recommendations.  A party may respond to another party's objections within fourteen (14) days
after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Failure to file objections within
fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.